# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## JANUARY SESSION, 1996

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 02C01-9502-CC-00043** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **HARDIN COUNTY** |
| **VS.** | ) | |
| | ) | **HON. CREED MCGINLEY** |
| **MARIO GUTIERREZ**, | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(Delayed Appeal)** |

**FILED**

**May 15, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

<u>FOR THE APPELLANT</u>:

Mr. Donald Holt
216 Dr. Hicks Blvd. West
Florence, AL  35631

Mr. Lee Lackey
507 Water Street
Savannah, TN  38372

Larry Bryant
P. O. Box 663
Camden, TN  38120

<u>FOR THE APPELLEE</u>:

Charles W. Burson
Attorney General and Reporter

Michael J. Fahey, II
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN  37243

Robert Radford
District Attorney General

John Overton
Assistant District Attorney
Hardin County Courthouse
Savannah, TN  38372

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

This is a delayed appeal granted by the trial court pursuant to Tenn. Code Ann. § 40-30-120 (1990). Appellant Mario Gutierrez seeks relief from his 1992 voluntary manslaughter conviction which resulted from the fatal shooting of Ms. Deborah McKee, his girlfriend with whom he lived. Mr. Gutierrez received a six year sentence as a Range 1 standard offender. He was also fined $10,000. There are four issues presented for review:

(1)  whether the evidence is legally sufficient to support the verdict;

(2)  whether the prosecution unconstitutionally used peremptory challenges to remove two prospective African-American jurors;

(3)  whether Appellant received the effective assistance of counsel at his trial; and

(4)  whether Appellant's sentence was excessive.

After a review of the record, we find no error and affirm the judgment of the trial court.

## I. Sufficiency of Evidence

When an appeal challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318 (1979); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992); Tenn. R. App. P. 13(e). In a criminal trial, great weight is given to the result reached by the jury. State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The weight and credibility of the testimony offered at trial are matters entrusted exclusively to the jury as trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt points unerringly at the defendant and the defendant alone." State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985).

Once approved by the trial court, a jury verdict accredits the witnesses presented by the State and resolves all conflicts in favor of the State. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Moreover, a guilty verdict removes the presumption of innocence and raises a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant then bears the burden of overcoming this presumption of guilt on appeal. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991).

Viewed in the light of these well-established standards of appellate review, the record reflects that on January 12, 1992, Deborah McKee was shot and killed in the home she shared with Appellant. The medical examiner, Dr. Jerry Francisco, testified that the fatal gunshot wound was inflicted to the left side of Ms. McKee's head, just above the eyebrow. The wound indicated that the gun had been less that two feet from Ms. McKee's head, but not in contact with her head. Dr. Francisco stated that the wound to the left side of the head was inconsistent with suicide since the victim was right-handed. According to the

medical examiner, Ms. McKee had sustained abrasions and contusions over most of her body. The bruises on her back were consistent with her having been beaten by an object, and Ms. McKee's broken fingernails and injured hand indicated she had tried to defend herself.

The results of the gunshot residue test performed on Ms. McKee were more consistent with her having handled the gun than with her having fired the gun. While the test performed on Appellant was inconclusive, a gunshot residue expert testified that, in his opinion, Appellant was in close proximity of the gun when it was fired. Furthermore, a firearms expert testified that the gun in question would not have fired without a finger pulling the trigger.

According to a statement made by Appellant during the course of the police investigation, Ms. McKee returned home upset on the night of January 12, 1992. She complained of physical pain and other problems. She then stated that she was "going to finish this" and, after a discussion with Appellant, retrieved a gun from the living room cabinet. A struggle ensued as Appellant attempted to prevent Ms. McKee from harming herself. During the struggle, the gun fired, and a bullet struck Ms. McKee in the head. Appellant stated that while Ms. McKee lay on the floor bleeding, he took the gun to the bathroom and wrapped it in a wet towel to hide it from her. He then phoned the police and arranged to meet an ambulance at a nearby YMCA. He placed Ms. McKee on the floor of his van and departed. Appellant stated that, because of previous injuries suffered by Ms. McKee, he made no attempt to stop the bleeding or render first aid. The police officer who met the van testified that Ms. McKee was bleeding from the left side

of her head and that her blouse was open and "messed up." She died later that evening.

Other statements made by Appellant following the incident were somewhat inconsistent with the above statement. Appellant told one officer that Ms. McKee simply shot herself. Appellant told another officer that he and Ms. McKee quarreled and then she shot herself. Later, Appellant told a neighbor that Ms. McKee threatened to shoot him before the struggle for the weapon began. Moreover, Appellant initially reported to the police that Ms. McKee had no family, when, in fact, he had met members of her family in the past.

Witnesses described Ms. McKee as personable, optimistic, and cheerful on the day she was shot. In addition to working out at the YMCA, she spent approximately three hours with her friend Diana Thomas. Ms. Thomas testified that Ms. McKee was not upset and made no mention of any physical pain or other problems. Ms. Thomas also testified that Ms. McKee became nervous just before she departed for home.

According to witnesses, Ms. McKee intended to leave Appellant and return to Texas. A neighbor testified that Appellant had told him that he and Ms. McKee had argued about her leaving. Additionally, the neighbor testified that prior to the shooting, Appellant had shown him the gun which killed Ms. McKee. Ms. McKee's twin sister, Marti Bronikowski, a law enforcement officer in Texas, testified that she spoke with Ms. McKee by phone on the night of the incident. She stated that her sister was frightened and unhappy. Consequently, Ms. Bronikowski advised Ms. McKee to return to Texas. Ms. Bronikowski also

testified that her sister was disturbed by guns, displaying uneasiness when she was within sight of Ms. Bronikowski's service revolver.

Based on the foregoing evidence, the jury found Appellant guilty of voluntary manslaughter. Voluntary manslaughter is defined at Tenn. Code Ann. § 39-13-211(a) (1991) as:

> the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Appellant argues that the evidence is insufficient to support a jury finding that he intentionally shot Ms. McKee. We must disagree. The evidence revealed that Appellant and Ms. McKee were the only people present when the shooting occurred, that Appellant made inconsistent statements regarding the shooting, that Appellant and Ms. McKee were involved in a dispute concerning Ms. McKee's plan to return to Texas, and that physical evidence surrounding the weapon and the wound implicated Appellant. Because this proof was more than sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Appellant intentionally shot Ms. McKee, this issue is without merit.

## II. Use of Peremptory Challenges by the Prosecution

In Appellant's second issue, he alleges that the prosecution impermissibly used peremptory challenges to remove two African-American prospective jurors from the petit jury. The exercise of a peremptory challenge based solely on the race of the challenged prospective juror violates federal and state equal protection guarantees. Batson v. Kentucky, 476 U.S. 79, 89 (1986); State v. Jones, 789 S.W.2d 545, 548 (Tenn. 1990). However, the dismissal of one or

more black jurors, without more, is not unconstitutional. <u>State v. Bell</u>, 759 S.W.2d 651, 653 (Tenn. 1988). The defendant must present a <u>prima</u> <u>facie</u> case of racial discrimination by showing that the totality of the relevant facts surrounding the questioned peremptory challenge gives rise to an inference of discriminatory purpose. <u>Batson</u>, 476 U.S. at 94; <u>State v. Ellison</u>, 841 S.W.2d 824, 825 (Tenn. 1992). Once the defendant presents a <u>prima</u> <u>facie</u> case of discriminatory purpose, the burden shifts to the prosecution to provide a rational, race-neutral explanation for the exercise of the peremptory challenge. <u>Batson</u>, 476 U.S. at 94.

In this case, the prosecution used peremptory challenges to dismiss two African-American prospective jurors. In providing an explanation for the challenge to prospective juror Siner, the prosecution stated that Siner had been under more than one police investigation for drug- and alcohol-related activities. In providing an explanation for the challenge to prospective juror Sparks, the prosecution stated that Sparks had on voir dire untruthfully denied being related to an individual convicted of second degree murder. Nothing in the record indicates that the prosecutor was being less than candid in these assertions.

The trial court ruled that each reason given by the prosecution constituted a rational, non-racial basis for the exercise of a peremptory challenge. The record amply supports the ruling of the trial court. We find no unconstitutional use of peremptory challenges in this case.

### III. Assistance of Counsel

Appellant also argues that he failed to receive the effective assistance of counsel at trial, such that he was denied his constitutional right to counsel. When an appeal challenges the effective assistance of counsel, the standard of review is whether the representation was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Barr v. State , 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

In order to prove deficient performance, the defendant must establish that the representation fell below an objective standard of reasonableness. Id. at 462. On review, there is a strong presumption of satisfactory representation. Id. In order to prove prejudice, the defendant must establish that, but for counsel's ineffectiveness, a reasonable probability exists that the result of the proceedings would have been different. Id. A reasonable probability is defined as a probability sufficient to undermine confidence in the result. Id.; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994).

First, Appellant argues that trial counsel failed to file a timely motion to suppress Appellant's statement to the police. Appellant appears to base this argument on the fact that, in overruling an objection to the statement, the trial court stated that the issue should have been raised earlier. However, Appellant fails to demonstrate that, but for counsel's failure to file a timely motion to suppress the statement, a reasonable probability exists that the result of the proceedings would have been different. Furthermore, there is no evidence in the

record that the police obtained the statement in violation of Appellant's constitutional rights.

Second, Appellant argues that trial counsel failed to object to the testimony of Marti Bronikowski, twin sister of the victim. Appellant maintains that the testimony was objectionable because Ms. Bronikowski was improperly allowed to hear the testimony of other witnesses. In an effort to show prejudice, Appellant asserts that Ms. Bronikowski's testimony regarding a phone conversation with Ms. McKee on the night of the incident was vital to the prosecution in its effort to show that the shooting was intentional. However, according to the record, all testifying witnesses were properly removed from the courtroom at the beginning of the trial. The only members of the victim's family that remained in the courtroom were those that were not going to testify. No evidence exists in the record indicating that Ms. Bronikowski remained in the courtroom during the testimony of the other witnesses.

Third, Appellant argues that trial counsel failed to investigate Ms. Bronikowski for impeachment purposes. Appellant maintains that an adequate investigation would have revealed the following impeachment evidence: the fact that the phone call between Ms. Bronikowski and Ms. McKee did not appear on Appellant's phone card; the fact that Ms. Bronikowski had been forced to resign her employment; and the fact that Ms. Bronikowski had been physically removed from Ms. McKee's property on one occasion. During the hearing on Appellant's petition for post-conviction relief, trial counsel testified that he did conduct an investigation of Ms. Bronikowski. He stated that his investigator had made phone calls to Texas in an effort to locate impeachment evidence on Ms. Bronikowski.

-9-

Trial counsel also testified that he reviewed the results of the investigation with Appellant. No evidence exists in the record that the investigation performed by trial counsel was deficient. Even assuming that this investigation fell below an objective standard of reasonableness, Appellant has failed to show prejudice-- that, but for counsel's failure to satisfactorily impeach Ms. Bronikowski, a reasonable probability exists that the result of the proceedings would have been different. Because most of Ms. Bronikowski's testimony was cumulative, impeaching Ms. Bronikowski with the above evidence would, in all probability, have no made a difference in the outcome of the trial.

Thus, in light of Appellant's failure in each case to make a showing sufficient to overcome the strong presumption of satisfactory representation, we find that Appellant was afforded effective assistance of counsel at trial.

## IV. Sentencing

In his final issue Appellant alleges that his six year sentence is excessive and that he should have received some form of alternative sentence to incarceration. We will in turn discuss both the length of Appellant's sentence and his suitability for an alternative sentence.

When an appeal challenges the length, range, or manner of service of a sentence, this Court conducts a de novo review with a presumption that the determination of the trial court was correct. Tenn. Code Ann. § 40-35-401(d) (1990). However, this presumption of correctness is "conditioned upon the affirmative showing that the trial court in the record considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to demonstrate such

consideration, review of the sentence is purely de novo. Id. In conducting a review, this Court must consider the evidence, the presentence report, the sentencing principles, the arguments of counsel, the nature and character of the offense, mitigating and enhancement factors, any statements made by the defendant, and the potential for rehabilitation or treatment. State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). The defendant bears the burden of showing the impropriety of the sentence imposed. State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993).

We note initially that the trial judge did consider on the record the statutory sentencing principles and the facts and circumstances of the case. For this reason, our review of Appellant's sentence will be de novo with a presumption that the sentence is correct.

### A. Length of Sentence

In this case the jury convicted Appellant of voluntary manslaughter, a Class C felony. As a Range 1 standard offender for this offense Appellant's sentence must be between three and six years. Tenn. Code Ann. Sec. 40-35-112 (a)(3). In the absence of enhancement and mitigating factors, the presumptive sentence for a person in Appellant's situation is the minimum sentence in the range. Tenn. Code Ann. Sec. 40-35-210(c). Where one or more enhancement factors apply, but no mitigating factors exist, the trial court may properly sentence above the minimum but still within the range. Id. § 40-35-210(d). Where there are both enhancement and mitigating factors present the trial court must start at the minimum sentence, enhance within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight given to any existing enhancing or mitigating factor is left to the trial court's discretion so

-11-

long as the court complies with the purposes and principles of the sentencing act and the judge's findings are adequately supported by the record. State v. Shropshire, 874 S.W.2d 634 (Tenn. Crim. App. 1993).

In the instant case the trial court found the two following enhancement factors applicable to Appellant's case: Appellant employed a firearm during the commission of the offense, Tenn. Code Ann. Sec. 40-35-114(9); and Appellant abused a position of private trust, id. § 40-35-114(15). No mitigating factors were found applicable.

Appellant first argues that the enhancement factor dealing with the violation of a private trust is inapplicable to his case. The Tennessee Supreme Court has affirmed the application of this enhancement factor to an adult defendant who, while not the parent of his child victims, lived with the victims and their mother. State v. Adams, 864 S.W.2d 31,34 (Tenn. 1993). Apparently, no Tennessee case has dealt with the Application of section 40-35-114(15) to a defendant and victim who are both adults and members of the same household, as is the situation in the instant case. However, it is clear that members of a household are in a special position of trust with respect to one another. Presumably, this special trust is at least one of the factors leading to the decision to cohabit. Thus, we find the application of the enhancement factor found in 40-35-114(15) to be appropriate in this case.

Secondly, Appellant argues that his lack of any criminal history should have been considered in mitigation of his sentence pursuant to Tenn. Code Ann. Sec. 40-35-113(13) which allows consideration of any factor consistent with the purposes of the sentencing act as a mitigating factor. It is true that this Court has stated that a lack of criminal history may be considered as a mitigating factor under Sec. 40-35-113(13). State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App.

-12-

1995), N.2. Unlike <u>Bingham</u> in which the lack of a criminal record was considered in sentencing mitigation for a reckless vehicular homicide, the case <u>sub</u> <u>judice</u> involves the intentional or knowing killing of another human being. <u>See</u>, Tenn. Code Ann. Sec. 39-13-211. Under the circumstances and in view of the seriousness of the two applicable enhancement factors, any weight given to this mitigating factor is negligible. See e.g. <u>State v. Raines</u>, 882 S.W.2d 376, 386 (Tenn. Crim. App. 1994).

We therefore affirm the imposition of a six year sentence in this case.


## B. Manner of Sentence Service

Although Appellant does not specifically argue he should have received an alternative sentence to incarceration in the penitentiary, he obliquely makes reference to his suitability for such a sentence. We will therefore address the propriety of Appellant serving his sentence in the penitentiary.

The Tennessee Criminal Sentencing Reform Act of 1989 recognizes the limited capacity of state prisons and mandates that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts of rehabilitation shall be given first priority regarding sentencing involving incarceration." Tenn. Code Ann. § 40-35-102(5). A defendant who does not qualify as such and who is an especially mitigated or standard offender of a Class C, D, or E felony is "presumed to be a favorable candidate for sentencing options in the absence of evidence to the contrary." <u>Id</u>. § 40-35-102(6). A sentencing court may then only deny alternative sentencing when presented with sufficient evidence to overcome the presumption. <u>State v. Ashby</u>, 823 S.W.2d 166, 169

(Tenn. 1991). A denial of alternative sentencing in the face of the statutory presumption should be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

As a Range I standard offender Appellant is entitled to the presumption that he is entitled to an alternative sentence. Thus, the question becomes whether this presumption has been sufficiently rebutted. At the original sentencing hearing in this matter the trial judge cited the need to deter other acts of domestic violence in Hardin County as a reason for incarceration of Appellant. The trial judge indicated domestic violence was growing in the area however no specific evidence of the need for deterrence was ever presented in this case. Ordinarily the need for deterrence must be proven in a given case and a mere recitation of the need for deterrence is insufficient to sustain a denial of an alternative sentence. State v. Ashby, supra. at 170.

However, we need not address the issue of whether in this case deterrence may form the basis for the denial of an alternative sentence because the nature and circumstances of this offense require incarceration in order to avoid depreciating the seriousness of it. See, Tenn. Code Ann. Sec. 40-35-301(1)(B).

-14-

This particular crime arose out of an incident of domestic violence. This particular form of violence is one that is approaching epidemic proportions in our society. The statistics contained in the scholarly literature are quite startling.

> According to some estimates, there are as many as four million incidents of domestic violence against women every year. Federal Bureau of Investigation statistics indicate that a woman is beaten every eighteen seconds, and according to the Surgeon General, abuse inflicted by intimates constitutes one of the leading causes of injury to women in the United States. Thirty percent of women murdered in the United States are killed by their male partners. No segment of society is immune from this violence-- battering is prevalent among every economic, racial, and ethnic group.

Developments in the Law -- Legal Responses to Domestic Violence, 106 Harv. L. Rev. 1498, 1501(1993) (statistical citations omitted).

Another article states:

> [D]omestic violence remains the greatest cause of serious injury to American women, accounting for more injurious episodes than rape, auto accidents, and mugging combined. Other statistics are just as chilling. A woman is beaten every twelve seconds. Fifteen hundred women a year (approximately four per day) die at the hands of an abusive male partner. Roughly twenty-one thousand domestic crimes against women are reported every week -- more than a million assaults, murders, and rapes in a year. These are the reported crimes. Police estimate that for each of these crimes, three more go unreported. In all there are an estimated 1.8 to 4 million incidents of domestic violence each year.

(statistical citations omitted)

David M. Zlotnick, Empowering the Battered Woman: The Use of Criminal Contempt Sanctions to Enforce Civil Protection Orders, 56 Ohio St. L. J. 1153, 1156-57 (1995).

Given that Ms. McKee's death resulted from an episode of the serious and pervasive problem of domestic violence, it is the opinion of this Court that the

presumption of entitlement to an alternative sentence has been rebutted. A sentence of incarceration is warranted in order to avoid depreciating the seriousness of this offense.

The judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE


CONCUR:


_____
DAVID G. HAYES, JUDGE

_____
LYNN BROWN, SPECIAL JUDGE